## LOWELL et al. v. CHAISSON,
### and eight other cases.

(District Court, D. Massachusetts. June 13, 1924.)

### Nos. 1287, 1309, 1377, 1532, 1541, 1564, 1636, 1670, 1671.

1. **Bankruptcy ⊕166(4)—Newspaper publications charging insolvency of a debtor held to render payments received by creditors thereafter preferential.**

   Repeated newspaper publications, to the general effect that a debtor was insolvent and his business a swindle, *held* sufficient to charge creditors who received payment thereafter, and within four months prior to the debtor's bankruptcy, with reasonable cause to believe that he was insolvent, and to render the payments preferential.

2. **Bankruptcy ⊕166(4)—Actual good faith of creditor receiving preference is not a defense.**

   Actual good faith of a creditor receiving a preference is not a defense to a suit for its recovery, if reasonable cause to believe the debtor was insolvent is shown.

3. **Principal and agent ⊕146(1)—That preferential payment was received as agent for undisclosed principal not defense to suit for its recovery.**

   That creditors, who received preferential repayment of money lent, were handling money of others and not their own, cannot relieve them from liability for its return, where such fact was not disclosed, either when they lent the money or received repayment.

In Equity. Separate suits by James A. Lowell and others, trustees in bankruptcy of Charles Ponzi, against Daniel F. Chaisson, against Elizabeth Leveroni, against Domenico Ciampa, against William I. Cohen, against Charles Tortella, against Giovanni Sandulli, against S. Ferraro, against William B. Hodgson, and against Herbert S. Hill, to recover preferences. Decrees for complainants against some of the defendants.

In No. 1287:
Hugh D. McLellan, of Boston, Mass., for plaintiffs.
Samuel Kalesky, of Boston, Mass., for defendant.

In No. 1309:
Hugh D. McLellan and Littlefield & Tilden, all of Boston, Mass., for plaintiffs.
Elizabeth Leveroni, pro se.

In No. 1377:
Hugh D. McLellan, of Boston, Mass., for plaintiffs.
George Fine, of Boston, Mass., for defendant.

In No. 1532:
Hugh D. McLellan and Andrew Pierce, both of Boston, Mass., for plaintiffs.
Samuel Kalesky, of Boston, Mass., for defendant.

In No. 1541:
Hugh D. McLellan and W. F. Thayer, Jr., both of Boston, Mass., for plaintiff.
Cavanagh & Hendrick, of Boston, Mass., for defendant.

---

In No. 1564:
  Hugh D. McLellan and E. A. Pecce, both of Boston, Mass., for plaintiffs.
  - Grillo & Fralli, of Boston, Mass., for defendant.

In No. 1636:
  Hugh D. McLellan and John C. Bills, Jr., both of Boston, Mass., for plaintiffs.
  Frank Ramacorti, of Boston, Mass., for defendant.

In No. 1670:
  Hugh D. McLellan and Mack & Gammons, all of Boston, Mass., for plaintiffs.
  Leo B. Connolly, of Boston, Mass., for defendant.

In No. 1671:
  Hugh D. McLellan and Mack & Gammons, all of Boston, Mass., for plaintiffs.
  William J. McCarty, of Boston, Mass., for defendant.

MORTON, District Judge. These cases were heard consecutively under an agreement of parties that the general evidence as to Ponzi's business and reasonable cause to believe him insolvent, introduced in the first case, should be applicable to all.

In view of the recent decision of the United States Supreme Court in Cunningham, Trustee, v. Brown, 44 Sup. Ct. 424, 68 L. Ed. —— (April 28, 1924), the only open question is the date on which the several defendants had reasonable cause to believe that Ponzi was insolvent and that payment by him would constitute a preference. None of the defendants appear to have had any special knowledge or information about Ponzi. All of them lived in or near Boston, and they are all to be held of such knowledge of Ponzi and his affairs as a reasonably prudent and wide-awake person in this vicinity, doing business with him, would have. The plaintiff's evidence consists mostly or articles about Ponzi which appeared in the Boston newspapers, and it is upon these, in connection with the general story of his swindle, with which everybody is now familiar, that the question is to be determined.

By July, 1921, Ponzi's activities had become widely known, and they excited much public interest and discussion. Doubts were freely expressed whether his scheme was legitimate; but he continued to borrow money and to pay his notes. In the latter part of that month public officials began an investigation of his business. On July 27th, while this investigation was in progress, it was publicly announced that Ponzi had agreed not to accept any more loans. One of the newspapers had headlines on that date, "Ponzi Closes—Not Likely to Resume." On July 28th his offices were besieged by a disorderly mob of "investors," demanding their money back. On the same day a Boston newspaper published conspicuously a statement from officials of the Post Office Department to the effect that Ponzi could not have operated such a scheme as he claimed, and that the postal reports showed that no con-

siderable amount of coupons had been redeemed, and a financial newspaper in Boston published a statement, the plain inference of which was that the whole thing was a swindle. On July 30th another Boston newspaper published an article headed: "Coupon Plan is Exploded. New York Postmaster Says Not Enough in the Whole World to Make Fortune Ponzi Claims."

Ponzi issued various statements in reply to these articles, saying that they were untrue, and asserting that he was solvent and would pay in full all claims against him, and that his method of operation had not been discovered by the public authorities, etc. He brought an action for libel against the publisher of the article implying that he was a swindler. The run on his office lasted two or three days, and then, as he paid all his claims presented, it subsided. The notes which he had issued continued to be sold at substantial prices and were more or less speculated in. But they were recognized as a gamble, whose value depended upon whether Ponzi really had some method of making money unknown to other persons. Many people, misled by the effrontery of his statements, still believed that he had, and acted on their belief. On August 2d an article appeared in a morning newspaper of large circulation, stating that Ponzi was "hopelessly insolvent." Ponzi replied by issuing other statements and bringing action for libel against the writer of the article, and he continued to pay matured notes and to return without interest the money borrowed on unmatured notes until stopped by the bankruptcy proceedings on August 9th.

[1] In the light of after events, his scheme takes on the appearance of a transparent fraud from the very beginning. That this was not so is evidenced by the large number of his victims and by the hesitation of public officials to interfere with him. Foreign exchange was in fact in a very unsettled condition at the time when Ponzi operated; the general knowledge of that fact was the basis of his success. The wholly fraudulent character of his business did not become evident all at once. The fact that an enormous swindle had been perpetrated was a matter of rather gradual recognition by the public, becoming generally accepted during the last days of July or the first days of August. A number of persons believed in him to the end. After the article of August 2d, above referred to, there was certainly no longer room for reasonable belief in his solvency, and the Supreme Court has so decided. There is force to the argument that the articles published on July 28th virtually exposed the fraud and left no ground for reasonable belief in his solvency. But so many contradictory statements were being put out at that time that it was not easy for the average man to know what to believe. Ponzi was paying out money apparently in the regular course of business, and was permitted to do so for about 10 days longer without action by anybody to stop him. I therefore resolve the doubt as to the interval between July 28th and August 2d in favor of the defendants, and hold that, in the absence of special circumstances, reasonable cause to believe Ponzi insolvent existed on and after August 2d. In Lowell v. Broadbent (D. C.) 272 Fed. 536, and Lowell v. Thompson (D. C.) 297 Fed. 536, which are the only cases in which a return of an earlier payment has been ordered, the defendant either admitted that

he thought it was a swindle by which he had been caught, and so made haste to get his money back, or was found to have had that knowledge.

[2] None of the cases now before me show any special circumstances which take them out of the general rule. I have no doubt that in several instances the defendants did not in fact believe Ponzi to be insolvent; but under the law actual good faith is not a defense, where reasonable cause to believe is shown.

[3] In the cases of Herbert S. Hill and William I. Cohen the defendants testified that the money which they invested with Ponzi did not belong to them, but was intrusted to them by other persons for that purpose, and that the payments which they received belonged, not to them, but to the persons from whom they had received the money. Their agencies were not disclosed, either at the time when they made the investment or when they received payment. This being so, they cannot in this suit by the trustees avoid liability upon the ground that they were acting for somebody else.

Decrees accordingly.